## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND  )
ETHICS IN WASHINGTON  )
409 7th Street, N.W., Suite 300  )
Washington, D.C.  20004,  )
  )
MELANIE SLOAN  )
1229 Independence Avenue, S.E.  )
Washington, D.C.  20003,  )
  )
      Plaintiffs,  )
  )
  v.  )    Civil Action No.
  )
FEDERAL ELECTION COMMISSION,  )
999 E Street, N.W.  )
Washington, D.C.  20463  )
  )
      Defendant.  )

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1. This is an action for declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and 2 U.S.C. § 437g(a)(8), challenging as arbitrary, capricious, an abuse of discretion, and contrary to law the dismissal by the Federal Election Commission ("FEC" or "Commission") of two administrative complaints by Citizens for Responsibility and Ethics in Washington ("CREW") and CREW Executive Director Melanie Sloan against the American Action Network ("AAN") and Americans for Job Security ("AJS") respectively for failing to comply with the disclosure requirements the Federal Election Campaign Act of 1971 ("FECA" or "the Act") imposes on "political committees."

2. This also is an action for declaratory and injunctive relief under the APA, 5 U.S.C. §

706, challenging as arbitrary, capricious, and contrary to law the FEC's policy and/or de facto regulation, adopted without notice and an opportunity to comment, interpreting the "major purpose" test for determining which organizations are operating as political committees under the FECA as limited to a consideration of express advocacy (or its functional equivalent) only conducted during an ill-defined and ever-changing period of time.

## JURISDICTION AND VENUE

3. This action arises under the FECA, as amended by the Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155 ("BCRA"); the APA, 5 U.S.C. §§ 551-706; and the Declaratory Judgment Act, 2 U.S.C. § 2201.  The Court has both subject matter and personal jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1336; 5 U.S.C. §§ 701, 702, and 706; and 2 U.S.C. § 437g(a)(8)(A).  The APA, 5 U.S.C. § 702, gives private parties the right to seek injunctive relief when adversely affected or aggrieved by arbitrary or capricious agency action, as well as action that is contrary to law.

4. Venue in this district is proper pursuant to 28 U.S.C. § 1391(e), 5 U.S.C. § 703, and 2 U.S.C. § 437g(a)(8).

## PARTIES

5. Plaintiff CREW is a non-profit, non-partisan corporation organized under § 501(c)(3) of the Internal Revenue Code.  CREW is committed to protecting the rights of citizens to be informed about the activities of government officials, ensuring the integrity of government officials, and protecting our political system against corruption.  CREW works to advance reforms in the areas of campaign finance, lobbying, ethics, and transparency.  Further, CREW seeks to ensure campaign finance laws are properly interpreted, enforced, and implemented.

6. To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information to the public about public officials and their actions, and the outside influences that have been brought to bear on those actions. A core part of this work is examining and exposing the special interests that have influenced our elections and elected officials, and using that information to educate voters regarding the integrity of public officials, candidates for public office, the electoral process and our system of government.

7. Toward this end, CREW monitors the activities of those who run for federal office as well as those groups financially supporting candidates for office or advocating for or against their election. CREW regularly reviews campaign finance reports groups, candidates, and political parties file with the FEC that disclose their expenditures and, in some cases, their contributors. Using the information in those reports CREW, through its website, press releases, reports, and other methods of distribution, publicizes the role of these individuals and entities in the electoral process and the extent to which they have violated federal campaign finance laws.

8. CREW also files complaints with the FEC when it discovers violations of the FECA. Publicizing violations of the FECA and filing complaints with the FEC serve CREW's mission of keeping the public, and voters in particular, informed about individuals and entities that violate campaign finance laws and deterring future violations of campaign finance laws.

9. CREW is hindered in carrying out its core programmatic activities when those individuals and entities that attempt to influence elections and elected officials are able to keep their identities hidden. Likewise, the FEC's refusal to properly administer the campaign finance laws, particularly the FECA's reporting requirements, hinders CREW in its programmatic activity, as compliance with those reporting requirements often provides CREW with the only

source of information about those individuals and groups funding the political process.  As a result of the FEC's refusal to enforce the FECA's disclosure provisions, organizations like AAN and AJS have been able to pour vast amounts of "dark" or anonymous money into the political system without revealing the source of that money.  This deprives CREW of information critical to advancing its ongoing mission of educating the public to ensure the public continues to have a vital voice in our political process and government decisions.

10.  A large part of CREW's work in carrying out its central mission focuses on so-called "pay-to-play" schemes.  Toward that end, CREW looks for correlations between donations to the campaign of a member of Congress or candidate and that member's subsequent congressional activities, including pushing issues and legislation that serve the interests of the member's donors.  Information that an individual or entity made a large dollar contribution may be very revealing about the influences that donor has brought to bear on the member post-election.  Without information about the individuals and entities funding the political activities of organizations like AJS and AAN, CREW is stymied in fulfilling its central mission.

11.  As an example, in May 2013, CREW issued a report, *Rise of the Machines*, detailing the growing political influence of high frequency traders in Washington.  CREW's analysis was based in large part on the lobbying and campaign contribution records of 48 companies specializing in high frequency trading.  That data revealed that between the 2008 and 2012 election cycles, the campaign contributions of these firms increased by 673 percent, from $2.1 million during the 2008 election cycle to $16.1 million during the 2012 cycle.  CREW was able to obtain this information because of the disclosure requirements to which the organizations receiving those contributions – federal candidates, party committees, PACs, and super PACs –

4

are subject under the FECA.

      12.  As another example, CREW published *Stealth Donors*, a December 2012 report on donors who gave more than $1,000,000 to super PACs trying to influence the 2012 election.  The report revealed a dozen donors with policy or business interests that depended on the outcome of the elections, but whose efforts to sway voters largely were out of the public view.  CREW obtained the information used in this report from information the FECA requires political committees to disclose.

      13.  For organizations like AJS and AAN that refuse to identify themselves as political committees and comply with the FECA's disclosure requirements CREW has no access to information detailing the sources of the money they are using for political purposes.  As a result, CREW is harmed when the FEC fails to properly administer the FECA, particularly the statute's reporting requirements, thereby limiting CREW's ability to obtain and review campaign finance information.

      14.  Plaintiff Melanie Sloan is the executive director of CREW, a citizen of the United States, and a registered voter and resident of the District of Columbia.  As a registered voter, Ms. Sloan is entitled to receive all the information the FECA requires political committees to report publicly and to the FEC's proper administration of the provisions of the FECA.  Ms. Sloan is harmed in exercising her right to an informed vote when a political committee fails to disclose the source of its funds used for political activities, as the FECA requires.

      15.  Ms. Sloan also is personally committed to ensuring the integrity of federal elections. Toward that end, Ms. Sloan reviews campaign finance filings and media reports to determine whether candidates and political committees are complying with the FECA's requirements.

When Ms. Sloan discovers a violation of the FECA, she submits complaints against violators pursuant to her rights under the law, 2 U.S.C. § 437g(a)(1).

16.  When CREW and Ms. Sloan file complaints against violators of the FECA, they rely on the FEC, as the exclusive civil enforcement authority, to comply strictly with the FECA when making its enforcement decisions. *See* 2 U.S.C. § 437d(e).  CREW and Ms. Sloan are harmed and are "aggrieved" parties when the FEC dismisses their complaints contrary to the FECA, refuses to enforce the FECA's mandatory disclosure requirements, or otherwise acts contrary to the requirements of the FECA.  2 U.S.C. § 437g(a)(8)(C).

17.  Ms. Sloan also is harmed in her ability to communicate to the public and other voters information about the source of funds used for political activities.

18.  CREW and Ms. Sloan are further harmed by the FEC's ongoing policy and/or de facto regulation misinterpreting the disclosure requirements for political committees as limited to an evaluation of express advocacy (or its functional equivalent) conducted within an undefined and ever-changing period of time.  As a result of this unlawful policy and/or de facto regulation, CREW and Ms. Sloan are denied access to the public disclosure reports the FECA requires of political committees, which contain information they need in order to evaluate the influence of money in politics and, for Ms. Sloan to exercise her right to an informed vote.

19.  Defendant FEC is an agency within the meaning of 5 U.S.C. § 552(f) and was established by Congress to oversee the administration and civil enforcement of the FECA.  *See* 2 U.S.C. §§ 437c, 437c(b)(1).

## STATUTORY AND REGULATORY FRAMEWORK

20  The FECA and implementing FEC regulations impose on "political committees"

6

registration, organization, and disclosure requirements.  2 U.S.C. §§ 432, 433, and 434.

21.   The FECA and implementing FEC regulations define a "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year."  2 U.S.C. § 431(4)(A); 11 C.F.R. § 100.5(a).

22.   The FECA further defines an "expenditure" as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office."  2 U.S.C. § 431(9)(A).  The Supreme Court has clarified that "expenditures" for the purpose of this definition include only "funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Buckley v. Valeo*, 424 U.S. 1, 80 (1976).

23.   The FECA and FEC regulations define an "independent expenditure" as one made for a communication "expressly advocating the election or defeat of a clearly identified candidate," and "that is not made in cooperation, or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party committee or its agents."  2 U.S.C. § 431(17); 11 C.F.R. § 100.16.

24.   The FECA defines a "contribution" for these purposes as "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office."  2 U.S.C. § 431(8)(A).

25.   Only organizations with a "major purpose" of nominating or electing federal candidates can be "political committees."  *Buckley*, 424 U.S. at 79.

26.   Accordingly, under the FECA there is a two-part test for status as a political

committee that asks: (1) whether the organization has made more than $1,000 in expenditures or received more than $1,000 in contributions during a calendar year, and (2) whether the major purpose of the organization is the nomination or election of a candidate.

27.   The FEC conducts a fact-intensive, case-by-case analysis of an organization to determine if its major purpose is the nomination or election of federal candidates.  Federal Election Commission, Political Committee Status, Supplemental Explanation and Justification, 72 Fed. Reg. 5595, 5601 (Feb. 7, 2007) ("Supplemental E&J").  An organization can meet the major purpose test through sufficiently extensive spending on federal campaign activity.  *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986); Supplemental E&J.

28.   Through the Supplemental E&J the FEC provided additional guidance on the factors it uses to determine an organization's major purpose.  These include, *inter alia*, public and non-public statements about the organization's purposes and activities; public and non-public fundraising appeals; and the proportion of spending related to "federal campaign activity" compared to the proportion spent on "activities that [a]re not campaign related."

29.   The FEC periodically has considered proposed rulemakings that would have determined an organization's "major purpose" by reference to a bright-line rule, but has consistently declined to adopt this approach.

30.   The FEC's decision in 2004 not to adopt a regulatory definition of "major purpose" was challenged in litigation, *Shays v. FEC*, 424 F. Supp. 2d 100 (D.D.C. 2006).  The district court found the FEC had failed to offer "a reasoned explanation for its decision" to engage in a case-by-case decision making rather than a rulemaking, and remanded the matter to the FEC to explain its decision.  *Id.* at 116-17.

31. On remand, the FEC issued the Supplemental E&J.  To provide the public with additional guidance, the Supplemental E&J referenced enforcement cases already part of the public record, advisory opinions the FEC issues, and filings in civil enforcement cases following the 2004 proposed rulemaking.  As the FEC noted, settlements in several Matters Under Review ("MURs") involving section 527 organizations "provide considerable guidance to all organizations" regarding the application of the major purpose test, and "reduce any claim of uncertainty because concrete factual examples of the Committee's political committee analysis are now part of the public record."

32. In a subsequent challenge to the Supplemental E&J by the *Shays* plaintiffs, *Shays v. FEC*, 511 F. Supp. 2d 19 (D.D.C. 2007), the district court upheld the FEC's case-by-case approach as an appropriate exercise of the agency's discretion.

33. The FECA and FEC regulations require all political committees to register with the FEC within 10 days of becoming a political committee.  2 U.S.C. § 433(a); 11 C.F.R. § 102(d).

34. Further, under the FECA and implementing FEC regulations, political committees must file periodic reports with the FEC that, among other things: (1) identify all individuals contributing an aggregate of more than $200 in a year to the organization, and the amount each individual contributed; (2) identify all political committees making a contribution to the organization, and the amount each committee contributed; (3) detail all of the organization's outstanding debts and obligations; and (4) list all of the organization's expenditures.  2 U.S.C. § 434(a)(4); 11 C.F.R. § 104.1(a).

35. These reporting requirements extend to "electioneering communications," which the FECA and FEC regulations define as "any broadcast, cable, or satellite communication" referring

9

to "a clearly identified candidate for Federal office," and made within "60 days before a general, special, or runoff election . . . or . . . 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate[.]" 2 U.S.C. § 434(f)(3); 11 C.F.R. § 100.29(a).

36. Under the FECA, any person who believes there has been a violation of the FECA may file a sworn complaint with the FEC. 2 U.S.C. § 437g(a)(1). Upon receipt of a complaint, the FEC has five days in which to notify the person or persons alleged in the complaint to have violated the Act. *Id.* The respondent then has 15 days to demonstrate to the FEC that no action should be taken based on the complaint. *Id.*

37. Based on the complaint, response, and any recommendation of the FEC Office of General Counsel ("OGC"), the FEC may then vote on whether there is "reason to believe" a violation of the FECA has occurred. 2 U.S.C. § 437g(a)(2). If the FEC finds there is "reason to believe" a violation of the FECA has occurred, the FEC must notify the respondents of that finding and must "make an investigation of such alleged violation." *Id.*

38. After the investigation, the FEC's general counsel may recommend the FEC vote on whether there is "probable cause" to believe the FECA has been violated. 2 U.S.C. § 437g(a)(3). The general counsel must notify the respondents of any such recommendation and provide them with a brief stating the position of the general counsel on the legal and factual issues presented. *Id.* Within 15 days of receiving the brief, respondents may submit their own brief on the legal and factual issues presented in the case and replying to the brief of the general counsel. *Id.*

39. Upon consideration of these briefs, the FEC may then determine whether there is "probable cause" to believe a violation of the FECA has occurred. 2 U.S.C. § 437g(a)(4)(A)(I).

If the FEC finds probable cause to believe a violation of the FECA has occurred, the FEC must

attempt for at least 30 days, but not more than 90 days, to resolve the matter "by informal

methods of conference, conciliation and persuasion," *id.*, a process that does not involve the

complainant.

40. If the FEC is unable to settle the matter through informal methods, it may institute a

civil action for legal and equitable relief in the appropriate United States district court. 2 U.S.C.

§ 434g(a)(6)(A). In any action instituted by the FEC, a district court may grant injunctive relief

as well as impose monetary penalties. 2 U.S.C. §§ 437g(a)(6)(B)-(C).

41. If at any stage of the proceedings the FEC dismisses a complaint, any "party

aggrieved" may seek judicial review of that dismissal in the United States District Court for the

District of Columbia. 2 U.S.C. § 437g(a)(8)(A). All petitions from the dismissal of a complaint

by the FEC must be filed "within 60 days after the date of the dismissal." 2 U.S.C. §

437g(a)(8)(B).

42. The district court reviewing the FEC's dismissal of a complaint may declare the

FEC's actions "contrary to law." 2 U.S.C. § 437g(a)(8). The court also may order the FEC "to

conform with such declaration within 30 days." *Id.* If the FEC fails to abide by the court's order,

the FECA provides the complainant with a private right of action, brought in its own name, "to

remedy the violation involved in the original complaint." *Id.*

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS FOR RELIEF

### American Action Network

43. The Washington, D.C. based American Action Network, formed in July 2009, is a

tax-exempt organization organized under section 501(c)(4) of the Internal Revenue Code.

44. AAN describes its mission as creating, encouraging, and promoting center-right policies based on the principles of freedom, limited government, American exceptionalism, and strong national security, and states as its "primary goal" "to put our center-right ideas into action by engaging the hearts and minds of the American people and spurring them into active participation in our democracy."

45. Between July 23, 2009, and June 30, 2011, according to reports AAN filed with the FEC, AAN spent at least $18,135,535 on independent expenditures and electioneering communications. The money was spent largely producing and broadcasting television and Internet advertisements in 29 primary and general elections. AAN reported independent expenditures of $4,096,910 and electioneering communications of $14,038,625 between July 23, 2009, and June 30, 2011.

46. Further, AAN spent significant funds on electioneering communications. For example, starting on October 22, 2010, just weeks before the election, AAN spent $725,000 broadcasting an advertisement against Rep. Ed Perlmutter (D-CO) that expressed disbelief "convicted rapists can get Viagra paid for by the new health care bill." Noting Rep. Perlmutter had voted for the Affordable Care Act (which did not, in fact, pay for convicted rapists to obtain Viagra), the advertisement encouraged viewers to "tell Congressman Perlmutter vote for repeal in November" and to "vote yes on H.R. 4903." The House went into recess at the end of September 2010, with no votes scheduled on H.R. 4903 or any other bill repealing the health care law during November 2010 or, indeed, the remainder of the 111th Congress. Accordingly, AAN's reference to a vote "in November" could have referred only to the upcoming congressional election in which viewers could vote.

47. AAN spent another $705,000 broadcasting an identical advertisement against Rep. Dina Titus (D-NV).

48. AAN spent $725,000 on a different advertisement that encouraged viewers to call Rep. Perlmutter "in November" and tell him to vote to repeal the health care law. AAN spent another $370,000 broadcasting an identical advertisement against Rep. Mark Schauer (D-MI).

49. AAN further reported millions of dollars spent on advertisements that did little more than call candidates "extreme" and tie them to former House Speaker Nancy Pelosi. As an example of this kind of electioneering communication, AAN spent $875,000 on an advertisement claiming Ann Kuster, the Democratic candidate for a New Hampshire House seat, supported massive tax hikes, and asserting "Nancy Pelosi is not extreme. Compared to Annie Kuster." Similarly, AAN spent $224,000 on an advertisement asserting Mike Oliverio, the Democratic candidate for a West Virginia House seat, supported Mrs. Pelosi and would do whatever she told him to.

50. On its 2009 tax return filed with the Internal Revenue Service ("IRS"), AAN reported spending a total of $1,446,675 on all activities for the period July 23, 2009, through June 30, 2010. On its 2010 tax return covering July 1, 2010, through June 30, 2011, AAN reported spending a total of $25,692,334 on all activities.

51. Combined, AAN reported to the IRS spending a total of $27,139,009 from July 23, 2009, through June 30, 2011. As a result, AAN's spending on independent expenditures and electioneering communications for this period – the first two years of its existence – comprised 66.8 percent of its total spending.

**Americans for Job Security**

52. The Alexandria, Virginia based organization Americans for Job Security, formed in 1997, is a tax-exempt organization organized under section 501(c)(6) of the Internal Revenue Code. Its president and treasurer is Stephen DeMaura.

53. AJS describes itself as an "independent, bi-partisan, pro-business issue advocacy organization" with a chief goal of "educating the public on issues of importance to businesses and encouraging a strong job-creating economy that promotes a pro-growth agenda." According to its articles of incorporation, it was incorporated for the purpose of uniting "in a common organization businesses, business leaders, entrepreneurs, and associations of businesses" and to "promote the common business interest of its members . . . by helping the American public to better understand public policy issues of interest to business." AJS's tax return describes the organization as "promot[ing] governmental policy that reflects economic issues of the workplace" by "educating the public through television, radio, and newspaper and direct mail advertising[.]"

54. Between January 15 and October 31, 2010, according to reports AJS filed with the FEC, AJS spent $8,971,043 on independent expenditures and electioneering communications, largely on broadcasting television and Internet advertisements in 20 primary and general elections.

55. AJS reported to the FEC spending $4,414,524 on independent expenditures and $4,556,519 on electioneering communications through October 31, 2010, and $4,908,846 on independent expenditures and electioneering communications for calendar year 2010.

56. All of the advertisements AJS reported as independent expenditures for calendar year

14

2010 expressly advocated the election or defeat of identified candidates for federal office.

57.  AJS also spent significant funds on electioneering communications.  For example, AJS spent $479,268 on January 15, 2010, producing and broadcasting an advertisement promoting Scott Brown, then a state senator and the Republican candidate in the January 19, 2010 special election for a U.S. Senate seat in Massachusetts.  AJS's advertisement first told viewers that "behind closed doors, Washington decides the future of our health care, with no transparency or accountability.  They are slashing Medicare and raising taxes, and only listening to the special interests."  AJS then said that "one Massachusetts leader says slow down, get health care right.  Scott Brown says protect Medicare, don't raise taxes, listen to the people, not the lobbyists."  AJS's advertisement concluded by encouraging voters to "call Scott Brown and tell him you agree Washington should listen to us on health care for a change."

58.  AJS spent $913,096 on May 3, 2010, producing and broadcasting an advertisement criticizing William (Bill) Halter, then lieutenant governor of Arkansas and a candidate in the June 8, 2010 primary election for the Democratic nomination for a U.S. Senate seat in Arkansas.  In AJS's advertisement, several Indian speakers ostensibly "thanked" William Halter for providing jobs to India.  The narrator then stated, "while millionaire Bill Halter was the highly paid director of a U.S. company, they exported jobs to Bangalore, India," and "with almost 65,000 Arkansans out of work, we need jobs, too."  AJS's advertisement concluded by stating "Bangalore says 'thanks' Bill Halter.  Arkansas, tell Bill Halter thanks for nothing."

59.  AJS spent $490,000 on May 6, 2010, producing and broadcasting another advertisement criticizing Mr. Halter.  This advertisement first told viewers that "politicians – they say one thing, and do another."  AJS's advertisement then stated, "Bill Halter says he's

15

never outsourced American jobs, but the facts say that when he was a highly paid corporate director, his company outsourced jobs to India.  Those jobs could have boosted a community here in Arkansas, but all they boosted was Bill Halter's company's bottom line."  The advertisement concluded by encouraging voters to "call Bill Halter, tell him to support policies for job creation here in America."

60.  AJS spent $143,000 on June 24, 2010, producing and broadcasting an advertisement promoting Ken Buck, then a county district attorney and candidate in the August 10, 2010 primary election for the Republican nomination for a U.S. Senate seat in Colorado.  AJS's advertisement first told viewers that "Washington is a cesspool filled with political insiders who think more government is the solution."  AJS's advertisement then stated: "Not Ken Buck.  Ken Buck stands up to the insiders in both parties.  Ken Buck's conservative plan to get Colorado back to work: No to bailouts, no to debt, no to big government spending.  Yes to low taxes for job creation that helps families."  AJS's advertisement concluded by encouraging voters to "call Ken Buck, tell him to keep fighting for smaller government and policies that support taxpayers."

61.  AJS spent an additional $171,700 on June 29, 2010, broadcasting the same advertisement, and $126,496.70 on July 6, 2010, again broadcasting it.

62.  AJS spent $318,874.30 on July 13, 2010, producing and broadcasting an advertisement criticizing Mr. Buck's opponent in the August 10, 2010 primary election, Jane Norton, a former lieutenant governor who was no longer in office.  This advertisement began by stating, "our country is at the brink – Colorado workers and families need relief."  AJS's advertisement then stated: "Yet, Jane Norton supported the largest tax hike in Colorado history, costing us billions.  And Jane Norton's record on government spending?  The state bureaucracy

she managed grew by $43 million in just three years." The advertisement concluded by

encouraging voters to "call Jane Norton, tell her no more tax hikes and government spending."

AJS spent an additional $175,956.60 on July 20, 2010, broadcasting this same advertisement.

63.   AJS spent $585,800 on July 26, 2010, broadcasting another advertisement criticizing

Ms. Norton. This advertisement began by stating, "liberal politicians will say anything, but talk

is cheap," as photographs of Ms. Norton, President Obama, and Sen. Michael Bennet (D-CO)

were shown. AJS's advertisement then asserted the "real Norton record" is that "Norton pushed

the largest tax hike in Colorado history, as a regulator she managed a multimillion dollar surge in

government spending. Yup, talk is cheap. But Jane Norton's real record has cost us plenty."

The advertisement concluded by encouraging voters to "tell Jane Norton no more high taxes and

spending."

64.   AJS spent $45,100 on July 26, 2010, producing and broadcasting an advertisement

criticizing Billy Long, then a candidate in the August 3, 2010 primary election for the Republican

nomination for a U.S. House seat in Missouri, who had never before held a public office. AJS's

advertisement first told viewers "reckless spending, earmarks, debt – bankrupting our country.

Politicians and insiders are at the trough." The advertisement then said, "take Billy Long – he

says he's against earmarks, but while on the airport board of directors he voted to use more than

$3 million in congressional earmarks for a brand new bus terminal. A terminal that now sits

empty. The Billy Long bus terminal to nowhere." AJS's advertisement concluded by

encouraging voters to "call Billy Long and tell him we're sick of earmarks and bus terminals to

nowhere."

65.   AJS spent $54,572 on September 7, 2010, producing and broadcasting an

17

advertisement criticizing Rep. Harry Teague (D-NM), then a candidate in the November 2, 2010 election for a U.S. House seat in New Mexico. AJS's advertisement first told viewers the economy is in "a tailspin" with "unemployment on the rise," and "they just continue the taxing, spending, and bailouts." The advertisement then said, "Harry Teague was instrumental in passing a job-killing cap and trade bill. Teague's tax would mean higher electric rates for families, higher gas prices, and cost us up to 12,000 jobs in New Mexico." AJS's advertisement concluded by encouraging voters to "tell Harry Teague to stop his reckless spending, bailouts, and job-killing taxes."

66. AJS spent $980,256 on October 20, 2010, broadcasting an advertisement criticizing Gov. Joe Manchin (D-WV), then a candidate in the November 2, 2010 general election for a U.S. Senate seat in West Virginia. AJS's advertisement said: "You've heard about how Joe Manchin supported the Obama stimulus that wasted money on turtle tunnels, ant research, and cocaine for monkeys. But that's not their only waste. Their stimulus wasted money on studying the atmosphere of Neptune, hunting for dinosaur eggs in China, and even the international accordion festival. We asked for jobs. What we got was waste. Really." The advertisement concluded by encouraging voters to "tell Obama and Manchin not to stimulate us anymore."

67. AJS also spent $72,100 on September 3, 2010, broadcasting an advertisement supporting Pat Toomey, then a candidate in the November 2, 2010 general election for a U.S. Senate seat in Pennsylvania.

68. From November 1, 2009, through October 31, 2010 – AJS's fiscal year – AJS reported to the IRS spending a total of $12,417,809 on expenditures. As a result, AJS's spending on independent expenditures and electioneering communications for this period comprised 72.2

percent of its total spending.

## Plaintiffs' Administrative Complaints

*AAN*

69. On June 7, 2012, plaintiffs CREW and Melanie Sloan filed a complaint with the FEC against AAN for violations of the FECA ("MUR 6589"). The complaint alleged, as demonstrated by its extensive spending on federal campaign activities, the major purpose of AAN between July 23, 2009, and June 30, 2011, was the nomination or election of federal candidates. As a result, AAN violated the FECA, 2 U.S.C. § 433(a), and implementing FEC regulations, 11 C.F.R. § 102.1(d), by failing to register as a political committee. Count II of the complaint alleged AAN violated the FECA, 2 U.S.C. § 434(a)(4), and 11 C.F.R. § 104.1(a), by failing to file periodic reports with the FEC identifying, *inter alia*, all individuals contributing an aggregate of more than $200 a year to AAN and the amount each individual contributed; all political committees that made a contribution to AAN and the amount each committee contributed; AAN's outstanding debts and obligations; and all of AAN's expenditures.

70. On January 17, 2013, the FEC's OGC issued the First General Counsel's Report ("AAN Report") recommending that the Commission find reason to believe AAN had as its major purpose the nomination or election of federal candidates during 2010, and therefore violated 2 U.S.C. §§ 432, 433, and 434 by failing to organize, register, and report as a political committee. The OGC recommended the Commission authorize an investigation into the matter.

71. The AAN Report stated that between July 2009 and June 2011, AAN spent at least $4,096,910 on independent expenditures, of which approximately $4,044,572 was spent in 2010. As a result, AAN far exceeded the $1,000 statutory threshold for political committee status under

2 U.S.C. § 431(4)(A) and 11 C.F.R. § 100.5. The AAN Report further stated the group spent at least $12,968,445 on electioneering communications during 2010.

72. Turning to the issue of AAN's major purpose, the AAN Report stated that under the FEC's case-by-case approach, which considers an entity's "'overall conduct,' including its disbursements, activities and statements," the proportion of AAN's spending related to federal campaign activity "is alone sufficient to establish that its major purpose in 2010 was the nomination or election of federal candidates."

73. The AAN Report explained how this conclusion is consistent with past enforcement actions in which the FEC has "determined that funds spent on communications that support or oppose a clearly identified federal candidate, but do not contain express advocacy, should be considered in determining whether that group has federal campaign activity as its major purpose," as well as "the Commission's longstanding view – upheld by the courts – that the required major purpose test is not limited solely to express advocacy (or the functional equivalent of express advocacy)."

74. Evaluating the content of AAN's specific electioneering communications, the AAN report concluded they evidence AAN's major purpose is the nomination or election of federal candidates. The AAN Report explained all of the advertisements featured a clearly identified candidate, supported or opposed a candidate, and ran in the candidate's state shortly before a primary or general election. As a result, these advertisements constitute federal campaign activity indicative of AAN's major purpose. In reaching these conclusions, the AAN Report rejected AAN's argument that only its independent expenditures should count when determining its major purpose

75. The AAN Report also measured AAN's activities for the purpose of determining its major purpose based on a calendar year period, rather than AAN's fiscal tax years, explaining "a calendar year test provides the firmest statutory footing for the Commission's major purpose determination – and is consistent with FECA's plain language." More specifically, FECA defines "political committee" by reference to expenditures made or contributions received "during a calendar year." 2 U.S.C. § 431(4).

76. According to the AAN Report, using a group's fiscal tax year instead "could lead to absurd results." Two groups with identical spending patterns but different fiscal years could be evaluated differently based on the differences in their fiscal years, an "incongruous result" that "is underscored by the ability of a nonprofit organization to change its tax filing period with the IRS." Applying an analysis based on a calendar year also is consistent with the FEC's actions in the enforcement matters cited in the 2007 Supplemental E&J.

77. The AAN Report stated AAN appears to have spent at least $17,013,071 during 2010, or at least 62.6 percent of its total spending for that calendar year, on federal campaign activity. The AAN Report therefore concluded this spending shows the group's major purpose during 2010 was federal campaign activity.

78. Despite the detailed analysis of the AAN Report, on June 27, 2014, the Commission by a vote of three to three failed to find reason to believe AAN had violated 2 U.S.C. §§ 432, 433, and 434, and by a vote of six to zero closed the file.

79. On July 30, 2014, the FEC released the statement of reasons of the three commissioners voting against finding "reason to believe" – Chairman Lee E. Goodman and Commissioners Caroline C. Hunter and Matthew S. Peterson ("Goodman, Hunter, Petersen AAN

21

SOR"). These commissioners, "[a]s the controlling decision makers," concluded AAN's major purpose, based on its public statements, organizational documents, and overall spending history, "has been issue advocacy and grassroots lobbying and organizing."

80. In reaching this conclusion, the Goodman, Hunter, Petersen AAN SOR ignored the FEC's prior guidance, including its Supplemental E&J and its prior advisory opinions, and misconstrued prior court decisions. The unlawful and erroneous conclusions include: (1) for the purpose of determining an organization's major purpose, only spending on express advocacy or its functional equivalent may be considered in comparison to the organization's spending on activities unrelated to campaigns; (2) all of the approximately $13 million AAN spent on electioneering communications in 2010 was for "genuine issue advertisements"; and (3) an organizations's entire "lifetime of existence and activities," rather than its activities in a calendar or fiscal year, must be considered in determining the organization's major purpose.

81. On July 30, 2014, the three commissioners who voted to find reason to believe and to authorize further investigation – Vice Chair Ann M. Ravel and Commissioners Steven T. Walther and Ellen L. Weintraub – also issued a statement of reasons. They noted the impasse between the two blocks of commissioners has prevented the FEC from enforcing its own written policy, and explained that under that precedent the Commission examines not only an organization's public statements, but also its "full range of campaign activities." Agreeing with the AAN Report, the three commissioners found AAN spent "a minimum of $17 million on federal campaign activity in 2010," or at least 62.6 percent of its total spending, demonstrating it is a political committee "under the plain language of the Supplemental E&J.

82. The three commissioners voting for reason to believe also explained how the

"ongoing stalemate" over the FEC's major purpose policy overlooks its "entire purpose" –

"*disclosure*." With dark money an increasing problem, the mission of the FEC "is to ensure that

voters receive the information they need – the information that the Supreme Court has said they

are entitled to – in order to make informed decisions."

*AJS*

83. On March 8, 2012, plaintiffs CREW and Melanie Sloan filed a complaint with the

FEC against AJS for violations of the FECA ("MUR 6548"). The complaint alleged, as

demonstrated by its extensive spending on federal campaign activities, the major purpose of AJS

in 2010 was the nomination or election of federal candidates. As a result, AJS violated the

FECA, 2 U.S.C. § 433(a), and implementing FEC regulations, 11 C.F.R. § 102.1(d), by failing to

register as a political committee. Count II of the complaint alleged AJS violated the FECA, 2

U.S.C. § 434(a)(4), and 11 C.F.R. § 104.1(a), by failing to file periodic reports with the FEC

identifying, *inter alia*, all individuals contributing an aggregate of more than $200 a year to AJS

and the amount each individual contributed; all political committees that made a contribution to

AJS and the amount each committee contributed; AJS's outstanding debts and obligations; and

all of AJS's expenditures.

84. On May 2, 2013, the FEC's OGC issued the First General Counsel's Report ("AJS

Report") recommending that the Commission find reason to believe because AJS had as its

major purpose federal campaign activity during 2010, AJS violated 2 U.S.C. §§ 432, 433, and

434 by failing to organize, register, and report as a political committee. The OGC recommended

the Commission authorize the use of compulsory process to seek additional information about

the extent, nature, and cost of AJS's federal campaign activity and individuals with relevant

knowledge of this matter.

85.   The AJS Report stated that during calendar year 2010, AJS made approximately

$4,908,847 in independent expenditures, far exceeding the $1,000 statutory threshold for

political committee status under 2 U.S.C. § 431(4)(A) and 11 C.F.R. § 100.5.  In addition, the

AJS Report stated the group spent approximately $4,598,520 on electioneering communications

during 2010.

86.   Turning to the issue of AJS's major purpose, the AJS Report concluded under the

FEC's case-by-case approach, which considers an entity's "'overall conduct,' including its

disbursements, activities and statements," the proportion of AJS's spending related to federal

campaign activity "is alone sufficient to establish that its major purpose in 2010 was the

nomination or election of federal candidates."

87.   The AJS Report explained how this conclusion is consistent with past enforcement

actions in which the FEC has "determined that funds spent on communications that support or

oppose a clearly identified federal candidate, but do not contain express advocacy, should be

considered in determining whether the major purpose of a group is federal campaign activity, as

well as "the Commission's longstanding view – upheld by the courts – that the required major

purpose test is not limited solely to express advocacy (or the functional equivalent of express

advocacy)."

88.   Evaluating the content of AJS's specific electioneering communications, the AJS

Report concluded they demonstrate the major purpose of AJS is the nomination or election of

federal candidates.  The AJS Report explained all the advertisements featured a clearly identified

candidate, supported or opposed a candidate, and ran in the candidate's state shortly before a

24

primary or general election.  As a result, these advertisements constitute federal campaign

activity indicative of AJS's major purpose.  In reaching these conclusions, the AJS Report

rejected AJS's argument that only its independent expenditures should count when determining

its major purpose

89.   The AJS Report measured AJS's activities for the purpose of determining its major

purpose based on a calendar year, rather than the group's "entire history," explaining a calendar

year test "provides the firmest statutory footing for the Commission's major purpose

determination – and is consistent with FECA's plain language."  More specifically, the FECA

defines "political committee" by reference to expenditures made or contributions received

"during a calendar year."  2 U.S.C. § 431(4).

90.   The AJS Report concluded AJS appears to have spent at least $9,507,365 during

2010, or at least 76.5 percent of its total spending for that calendar year, on federal campaign

activity.  As a result, AJS's spending shows the group's major purpose during 2010 was federal

campaign activity.

91.   Despite the detailed analysis of the AJS Report, on June 27, 2014, the Commission

by a vote of three to three failed to find reason to believe AJS had violated 2 U.S.C. §§ 432, 433,

and 434, and by a vote of six to zero closed the file.

92.   On July 30, 2014, the FEC released the statement of reasons of the three

commissioners voting against finding "reason to believe" – Chairman Lee E. Goodman and

Commissioners Caroline C. Hunter and Matthew S. Petersen ("Goodman, Hunter, Petersen AJS

SOR").  These commissioners, "[a]s the controlling decision makers," concluded AJS's major

purpose, as "an organization that has spent less than ten percent of its funds on express advocacy

during its entire existence . . . is an issue-advocacy organization that cannot be regulated as a political committee."

93. In reaching this conclusion, the Goodman, Hunter, Petersen AJS SOR ignored the FEC's prior guidance, including its Supplemental E&J and its prior advisory opinions, and misconstrued prior court decisions. The unlawful and erroneous conclusions include: (1) for the purpose of determining an organization's major purpose, only spending on express advocacy or its functional equivalent may be considered in comparison to the organization's spending on activities unrelated to campaigns; (2) all of the approximately $4.6 million AJS spent on electioneering communications in 2010 was for "genuine issue advertisements"; and (3) an organizations's entire "lifetime of existence and activities," rather than its activities in a calendar or fiscal year, must be considered in determining the organization's major purpose.

94. On July 30, 2014, the three commissioners who voted to find reason to believe and to authorize further investigation – Vice Chair Ann M. Ravel and Commissioners Steven T. Walther and Ellen L. Weintraub – also issued a statement of reasons. They noted the impasse between the two blocks of commissioners has prevented the FEC from enforcing its own written policy, and explained that under that precedent the Commission examines not only an organization's public statements, but also its "full range of campaign activities." Agreeing with the AJS Report, the three commissioners found AJS spent "over $9.5 million" on federal campaign activity in 2010, or at least 76.5 percent of its total spending, demonstrating it is a political committee "under the plain language of the 2007 E&J."

95. The three commissioners voting for reason to believe also explained how the "ongoing stalemate" over the FEC's major purpose policy overlooks its "entire purpose" –

"*disclosure*."  With dark money an increasing problem, the mission of the FEC "is to ensure that voters receive the information they need – the information that the Supreme Court has said they are entitled to – in order to make informed decisions."

### Crossroads Grassroots Political Strategies

96.  The Commission's misapplication of its own and judicial precedent to conclude neither AAN nor AJS is a political committee mirrors the approach the FEC took in addressing a complaint filed against Crossroads Grassroots Political Strategies ("Crossroads GPS") ("MUR 6396"), a group founded by Republican strategists Karl Rove and Ed Gillespie.  Despite abundant evidence Crossroads GPS had operated as a political committee in 2010, including expenditures of $18 million on the 2010 campaign in the first four months of its inception, three commissioners – Chairman Lee E. Goodman and Commissioners Caroline C. Hunter and Matthew S. Petersen – voted against finding "reason to believe" Crossroads GPS had violated the FECA by failing to comply with the FECA's requirements for political committees.

97.  As with AAN and AJS, the three commissioners disregarded prior FEC guidance, including the Supplemental E&J and prior advisory opinions, and misconstrued prior court decisions to conclude Crossroads GPS did not have as its major purpose the nomination or election of a candidate.  In reaching this conclusion, the three limited their consideration to only evidence of express advocacy by Crossroads GPS, and refused to apply a calendar-year test, concluding a group's spending must instead be evaluated according to time periods utilized by the group.

98.  The FEC's refusal to take action against Crossroads GPS for violating the FECA is the subject of a pending lawsuit brought by the complainants in that matter: Public Citizen, Craig

Holman, ProtectOurElections.org, and Kevin Zeese (*Public Citizen v. FEC*, Civil No. 14-0148 (RJL) (D.D.C.)).

## PLAINTIFFS' CLAIMS FOR RELIEF

## COUNT ONE

### For Declaratory Judgment The FEC's Dismissal of MUR 6589 (AAN) Is Arbitrary, Capricious, And Contrary to Law

99.  Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

100.  The FEC's dismissal of the complaint in MUR 6589, which rested on an impermissible interpretation of the FECA, ignored prior FEC and judicial precedent, and mischaracterized political campaign activities as issue advertisements, is arbitrary, capricious, an abuse of discretion, and contrary to law in violation of 2 U.S.C. § 437g(a)(8)(C) and 5 U.S.C. § 706.

101.  The FEC's dismissal of the complaint in MUR 6589 based, in part, on a consideration of AAN's activities for an undefined period of time, rather than a calendar or fiscal year, is arbitrary, capricious, an abuse of discretion, and contrary to law in violation of 2 U.S.C. § 437g(a)(8)(C) and 5 U.S.C. § 706.

102.  Plaintiffs are therefore entitled to relief in the form of a declaratory order that defendant FEC is in violation of its statutory responsibilities under 2 U.S.C. § 437g(a)(8) and has acted arbitrarily and capriciously in dismissing MUR 6589.

## COUNT TWO

### For A Declaratory Judgment The FEC's Dismissal of MUR 6538 (AJS) Is Arbitrary, Capricious, and Contrary to Law

103.  Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

104.  The FEC's dismissal of the complaint in MUR 6538, which rested on an impermissible interpretation of the FECA, ignored prior FEC and judicial precedent, and mischaracterized political campaign activities as issue advertisements, is arbitrary, capricious, an abuse of discretion, and contrary to law in violation of 2 U.S.C. § 437g(a)(8)(C) and 5 U.S.C. § 706.

105.  The FEC's dismissal of the complaint in MUR 6538 based, in part, on a consideration of AJS's activities for an undefined period of time, rather than a calendar or fiscal year, and a mischaracterization of political campaign activities as issue advertisements is arbitrary, capricious, an abuse of discretion, and contrary to law in violation of 2 U.S.C. § 437g(a)(8)(C) and 5 U.S.C. § 706.

106.  Plaintiffs are therefore entitled to relief in the form of a declaratory order that defendant FEC is in violation of its statutory responsibilities under 2 U.S.C. § 437g(a)(8) and has acted arbitrarily and capriciously in dismissing MUR 6538.

### COUNT THREE

**For A Declaratory Judgment The Policy And/Or De Facto Regulation
Of The FEC Limiting The Major Purpose Test To Consideration
Of Express Advocacy Only During An Undefined Period Of Time
Is Arbitrary, Capricious, And Contrary To Law**

107.  Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

108.  Under the FECA, organizations that have as their major purpose political activity

29

must meet certain registration, organization, and disclosure requirements.  2 U.S.C. §§ 432, 433, and 434.

109.  Prior FEC precedent, including prior enforcement actions, the Supplemental E&J, and FEC advisory opinions, as well as prior judicial precedent require the FEC to consider activities that extend well beyond express advocacy for the purpose of determining political committee status.

110.  In defending its decision to reject a bright-line rule set forth in a regulation in favor of a case-by-case analysis, the FEC identified several factors that are part of its "major purpose" analysis and pointed as well to its prior adjudication of individual cases as providing prospective guidance in lieu of a bright-line rule.

111.  As reflected in a series of rulings in MUR 6589, 6538, and 6396, the FEC has now abandoned its prior precedent, as set forth in its prior adjudication of individuals cases and the Supplemental E&J, effectively abandoning its justification for not promulgating a bright-line rule for determining "major purpose" status.

112.  At the same time, while claiming to eschew a bright-line test, the FEC has, in effect, adopted just such a test that considers only express advocacy conducted during an ill-defined and ever-changing time period in determining whether an organization has as its major purpose campaign activity.  The FEC adopted this test with no prior notice or opportunity for public comment.

113.  The Commission's policy and/or de facto regulation for determining the major purpose of an organization, adopted without notice and an opportunity for public comment, is arbitrary, capricious, an abuse of discretion, and contrary to law.

114.  Plaintiffs are therefore entitled to relief in the form of a declaratory order that defendant FEC is in violation of its statutory responsibilities under the FECA and has acted arbitrarily and capriciously and contrary to law in adopting a policy and/or de facto regulation that considers only express advocacy conducted during an ill-defined and ever-changing time period in determining whether an organization has as its major purpose campaign activity.

## COUNT FOUR

### For Injunctive Relief Enjoining The FEC From Relying On Its Policy And/Or De Facto Regulation Limiting The Major Purpose Test To Consideration Of Express Advocacy Only During An Undefined And Ever-Changing Period Of Time

115.  Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

116.  Under the FECA, organizations that have as their major purpose political activity must meet certain registration, organization, and disclosure requirements.  2 U.S.C. §§ 432, 433, and 434.

117. Prior FEC precedent, including prior enforcement actions, the Supplemental E&J, and FEC advisory opinions, as well as prior judicial precedent require the FEC to consider activities that extend well beyond express advocacy for the purpose of determining political committee status.

118.  In defending its decision to reject a bright-line rule set forth in a regulation in favor of a case-by-case analysis, the FEC identified several factors that are part of its "major purpose" analysis and pointed as well to its prior adjudication of individual cases as providing prospective guidance in lieu of a bright-line rule.

119.  As reflected in a series of rulings on MURs, the FEC has now abandoned its prior precedent, as set forth in its prior adjudication of individuals cases and the Supplemental E&J, effectively abandoning its justification for not promulgating a bright-line rule for determining "major purpose" status.

120.  At the same time, while claiming to eschew a bright-line test, the FEC has, in effect, adopted just such a test that considers only express advocacy conducted during an ill-defined and ever-changing time period in determining whether an organization has as its major purpose campaign activity.  The FEC adopted this test with no prior notice or opportunity for public comment.

121.  The Commission's policy and/or de facto regulation for determining major purpose, adopted without notice and an opportunity for public comment, is arbitrary, capricious, an abuse of discretion, and contrary to law.

122.  Plaintiffs are therefore entitled to relief in the form of an injunction enjoining defendant FEC from relying on its policy and/or de facto regulation that considers only express advocacy conducted during an ill-defined and ever-changing time period in determining whether an organization has as its major purpose campaign activity.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request that this Court:

(1) Declare that the FEC's dismissal of MUR 6589 is arbitrary, capricious, an abuse of discretion, and contrary to law;

(2) Order the FEC to conform to such a declaration within 30 days pursuant to 2 U.S.C. § 437g(a)(8)(C);

32

(3) Declare that the FEC's dismissal of MUR 6538 is arbitrary, capricious, an abuse of discretion, and contrary to law;

(4) Order the FEC to conform to such a declaration within 30 days pursuant to 2 U.S.C. § 437g(a)(8)(C);

(5) Declare the policy and/or de facto regulation of the FEC to consider only express advocacy conducted during an ill-defined and result-oriented time period in determining whether an organization has as its major purpose campaign activity, adopted without notice and an opportunity for public comment, is arbitrary, capricious, an abuse of discretion, and contrary to law;

(6) Enjoin the FEC from relying on its policy and/or facto regulation under which it considers only express advocacy conducted during an ill-defined and ever-changing time period in determining whether an organization has as its major purpose campaign activity;

(7) Award plaintiff its costs, expenses, and reasonable attorneys' fees in this action; and

(8) Grant such other and further relief as the Court may deem just and proper.

<div style="margin-left: 40%;">

Respectfully submitted,

Anne L. Weismann
D.C. Bar No. 298190
Melanie Sloan
D.C. Bar No. 434584
Citizens for Responsibility and Ethics
 in Washington
409 7th Street, N.W., Suite 300
Washington, D.C.  20004
Telephone: (202) 408-5565
Fax: (202) 588-5020
Aweismann@citizensforethics.org

</div>

Dated: August 20, 2014