UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, et al.,**

Plaintiff,

v.

**FEDERAL ELECTION COMMISSION,**

Defendant,

**AMERICAN ACTION NETWORK, INC.,**

Intervenor Defendant.

Case No. 1:14-cv-01419 (CRC)

---

## MEMORANDUM OPINION

In 2010, American Action Network ("AAN")—a tax-exempt section 501(c)(4) organization—spent $1,065,000 on three versions of the following television advertisement, which ran in the districts of three different candidates for Congress in the lead-up to that year's election:

> [On-screen text:] Congress doesn't want you to read this. Just like [candidate]. [Candidate] & Nancy Pelosi rammed through government healthcare. Without Congress reading all the details. $500 billion in Medicare cuts. Free healthcare for illegal immigrants. Even Viagra for convicted sex offenders. So tell [candidate] to read this: In November, Fix the healthcare mess Congress made.

A.R. 1722. The Federal Election Commission ("FEC") reviewed this ad, along with nineteen other AAN-sponsored communications and nine similar "electioneering communications" sponsored by another non-profit, Americans for Job Security ("AJS"). Three Commissioners concluded that the organizations' spending on these ads should not be considered in evaluating whether either entity's "major purpose" was "the nomination or election of a candidate."

Buckley v. Valeo, 424 U.S. 1, 79 (1976).  On the basis of that analysis, the FEC—in accordance with the controlling votes of the three Commissioners—dismissed complaints against AJS and AAN, concluding that neither organization was an unregistered political committee in violation of the Federal Election Campaign Act ("FECA").

Plaintiff, Citizens for Responsibility and Ethics in Washington ("CREW"), which lodged the complaints, now challenges those dismissal decisions.  This Court previously dismissed CREW's claims to the extent that they relied on the Administrative Procedure Act ("APA"), but that same opinion recognized that CREW had an "adequate, alternative means to challenge" the FEC's decision through FECA's particularized judicial review mechanisms.  See CREW v. FEC, __ F. Supp. 3d __, 2015 WL 10354778, at *1 (D.D.C. Aug. 13, 2015).  The Court now considers cross-motions for summary judgment, the central dispute in which is whether the FEC's conclusion—that there was no "reason to believe" the organizations in question had as their "major purpose" the "nomination or election of a candidate"—was "contrary to law," 52 U.S.C. § 30109(a)(8)(C).  Finding that the controlling Commissioners premised their conclusion on an erroneous interpretation of Supreme Court precedent and the First Amendment, the Court agrees with CREW that the dismissals were contrary to law.  It will, accordingly, grant CREW's motion for summary judgment, deny the FEC's and AAN's cross-motions, and remand the case to the FEC for further proceedings consistent with this Opinion.

## I.   Background

### A.  Statutory and Regulatory Framework

The FEC is a six-member, independent agency charged with administering FECA.  See 52 U.S.C. § 30106(b)(1) (tasking the Commission with "administer[ing], seek[ing] to obtain compliance with, and formulat[ing] policy with respect to" FECA).  Any person or entity may

file a complaint with the Commission asserting a FECA violation, following which the alleged violator is given an opportunity to respond in writing. Id. § 30109(a)(1). If four or more Commission members subsequently find there is "reason to believe" that FECA was or will soon be violated, then the FEC must investigate. Id. § 30109(a)(2). Otherwise—i.e., where three or fewer Commission members have "reason to believe" FECA has been violated—the complaint is dismissed. See id. § 30106(c) ("[T]he affirmative vote of 4 members of the Commission shall be required in order for the Commission to take any [enforcement or other authoritative] action."). In the event of dismissal, the controlling group of Commissioners—here, those voting against enforcement—must provide a statement of reasons explaining the dismissal decision. See FEC v. Nat'l Republican Senatorial Comm. (NRSC), 966 F.2d 1471, 1476 (D.C. Cir. 1992). Any "party aggrieved" by an FEC dismissal decision "may file a petition" for this Court's review. Id. § 30109(a)(8)(A).

One way that FECA regulates federal campaign financing is by requiring disclosures for certain types of election-related communications. The Supreme Court has repeatedly recognized that such disclosure regimes accomplish much while costing relatively little. On the one hand, disclosure "open[s] the basic process of our federal election[s] to public view," Buckley, 424 U.S. at 82, by "provid[ing] the electorate with information" concerning the sources and outlets for campaign money, id. at 66, and thus "minimiz[ing] the potential for abuse of the campaign finance system," McCutcheon v. FEC, 134 S. Ct. 1434, 1459 (2014). On the other hand, disclosure imposes a relatively "less restrictive"—though not negligible—First Amendment burden on those subject to its requirements. McCutcheon, 134 S. Ct. at 1460; see also Citizens United v. FEC, 558 U.S. 310, 369 (2010); FEC v. Massachusetts Citizens for Life, Inc. (MCFL), 479 U.S. 238, 262 (1986).

FECA's disclosure requirements can be triggered by one-time events. When any entity spends more than $250 on an "independent expenditure"—a communication not coordinated with a candidacy but "expressly advocating the election or defeat of a clearly identified candidate," 52 U.S.C. § 30101—the organization must disclose the date and amount of that expenditure, as well as the identities of those who contributed and earmarked more than $200 for the communication. Similar reporting requirements apply when an entity spends more than $10,000 on "electioneering communications," a broader category including "broadcast, cable, or satellite" communications that "occur less than 60 days before a general [election or] 30 days before a primary," are "targeted to the relevant electorate," and which "refer[,]" without expressly advocating for or against, "a clearly identified [federal] candidate." Id. § 30104(f)(1)–(3). For expenditures on electioneering communications meeting the $10,000 threshold, the entity must disclose the identities of those who contributed and earmarked an aggregate of $1,000 or more for that expenditure. 52 U.S.C. § 30104(f)(2)(F).

More extensive disclosure rules govern "political committees." 52 U.S.C. § 30101. Political committees must, for example, appoint a treasurer, keep records with the names and addresses of contributors, and file with the FEC regular reports during a general election year with certain accounting information, including amounts spent on contributions and expenditures. Id. §§ 30102–04. An entity must register as a political committee when it satisfies two separate conditions. The first is straightforwardly spelled out in FECA: The entity in question must contribute or expend more than $1,000 in a calendar year for the purpose of influencing a federal election. Id. § 30101(4)(A). The second condition, imposed pursuant to a Supreme Court-authored narrowing construction, is at issue here and has previously been the subject of much dispute: If not controlled directly by a political candidate, the entity's "major purpose" must be

"the nomination or election of a candidate." Buckley, 424 U.S. at 79; see also MCFL, 479 U.S. at 262.

Rather than adopt a rule specifically defining the contours of this "major purpose" limitation, the FEC has pursued an adjudicative, case-by-case approach, an implementation choice which has been litigated, scrutinized, and ultimately validated by a fellow court in this District. Shays v. FEC, 424 F. Supp. 2d 100 (D.D.C. 2006). In response to a remand for further explanation regarding why adjudication and not rulemaking was the proper enforcement method, see id. at 108, the Commission explained in a notice published in the Federal Register that "determining political committee status . . . requires" a fact-intensive analysis of an organization's "overall conduct," meaning "whether its major purpose is Federal campaign activity (i.e., the nomination or election of a Federal candidate)." Political Committee Status, 72 Fed. Reg. 5595, 5597 (Feb. 7, 2007) (Supplemental Explanation and Justification ("SE & J")). The court accepted that explanation, deferring to the FEC's judgment that evaluating an organization's major purpose required "a very close examination of various activities and statements." Shays v. FEC, 511 F. Supp. 2d 19, 30 (D.D.C. 2007).

B.  Factual and Procedural History

AJS, one of two organizations alleged by CREW to be an unregistered political committee, was founded as a tax-exempt section 501(c)(6) organization, or "[b]usiness league," in 1997. A.R. 48–50; 26 U.S.C. § 501(c)(6). Since then, as AJS explained in its response to CREW's administrative complaint, the organization's consistent "message has been a simple one: free markets and pro-paycheck public policy are fundamental to building a strong economy and creating more and better paying jobs." A.R. 50, 98 (citing AJS's website). To spread that message, AJS spent millions on "television, radio, newspaper[,] and direct mail advertising[,]

amongst other forms" of communication.  A.R. 19 (2009 Form 990 Tax Return).  During its early years, AJS's efforts were not closely tied to elections: For instance, between 2004 and 2006, AJS ran a series of advertisements, none published or broadcast in the 30- or 60-day lead-up to primaries or elections, promoting the repeal of the estate tax, and others advocating against an asbestos trust fund.  A.R.  50–52.  However, over time, AJS shifted to a more election-focused approach: In 2008, the organization started funding "electioneering communications," and in 2010, it started funding "independent expenditures," i.e., express advocacy for or against certain candidates.  A.R. 52, 1393.  Indeed, in 2010, out of roughly $12.4 million in overall expenditures,[1] AJS spent approximately $4.9 million on express advocacy advertising and an additional $4.5 million on electioneering communications, meaning that over three-fourths of its spending was in some way tied to elections.  A.R. 1393–94.

AAN, the other organization challenged by CREW, is a tax-exempt section 501(c)(4) "[c]ivic" organization, founded in 2009.  A.R. 1490–91, 1562; 26 U.S.C. § 501(c)(4).  The organization's stated mission is to "create[], encourage[,] and promote center-right policies based on the principles of freedom, limited government, American exceptionalism, and strong national security."  A.R. 1490.  To advance that mission, AAN has sponsored "educational activities" and "grassroots policy events," A.R. 1563, but the majority of its spending throughout the period in question—mid-2009 through mid-2011—was on election-related advertising.  Over those two years, AAN spent roughly $27.1 million in total; of that, a little more than $4 million was devoted to independent expenditures (i.e., express advocacy for or against political candidates),

---

[1] Lacking data on AJS's overall receipts and expenditures for the 2010 calendar year, the FEC used AJS's fiscal-year information—i.e., covering a period from November 1, 2009 to October 31, 2010—as a proxy.  See A.R. 1463 n.151; A.R. 18.

and an additional $13.7 million was devoted to electioneering communications.  A.R. 1638.  In

other words, well over half of its spending during the period was election-related.

Neither AJS nor AAN registered with the FEC as a "political committee."  CREW filed a

complaint with the FEC against AJS in March 2012 alleging that due to AJS's extensive

campaign-related spending, primarily leading up to the 2010 federal election, the organization

was an unregistered political committee in violation of FECA.  A.R. 1–39.  In June 2012, CREW

filed a complaint with the FEC against AAN, similarly alleging that its predominantly campaign-

related spending between 2009 and 2011 made it an unregistered political committee.  A.R.

1480–1552.  The FEC's Office of General Counsel separately reviewed the complaints, as well

as answers from AJS and AAN, and recommended concluding that there was "reason to believe"

both organizations were political committees, having as their "major purpose federal campaign

activity," and therefore in violation of FECA.  A.R. 1411, 1659.  Nevertheless, in June 2014, the

Commissioners deadlocked 3-to-3 with respect to both AJS and AAN on whether to commence

an investigation, dismissing CREW's complaints accordingly.  A.R. 1434–35, 1686–87.

The controlling group of Commissioners issued separate but similar statements, for both

AJS and AAN, explaining their conclusions that there was no "reason to believe" either

organization was an unregistered political committee.  A.R. 1438–69 (Controlling

Commissioners' Statement of Reasons Regarding Dismissal of Complaint Against AJS) ("AJS

SOR"); A.R. 1690–1723 (Controlling Commissioners' Statement of Reasons Regarding

Dismissal of Complaint Against AAN) ("AAN SOR").  First, the Commissioners found—and no

party here contests—that both organizations "crossed the statutory threshold for political-

committee status by making over $1,000 in independent expenditures" in at least one calendar

year.  A.R. 1454, 1706.  However, after considering each organization's statements of purpose

and evaluating each entity's "spending on campaign activities [as compared to] its spending on activities unrelated to the election or defeat of a federal candidate," the Commissioners concluded that neither organization's "major purpose" was the "nomination or election of a federal candidate." A.R. 1455, 1706.

To reach those conclusions, the Commissioners made two key analytical decisions. First, they excluded from their "major purpose" inquiry *all* of AJS's and AAN's spending on electioneering communications, considering *all* of those communications to be "genuine issue advertisements" unrelated to the election of candidates. A.R. 1457–58, 1709–10.[2] As a result, only spending on express advocacy was considered indicative of the relevant "major purpose." Id. Second, the Commissioners considered spending only over the "lifetime" of the organization in question, which for AJS implicated a span of fifteen years. A.R. 1457–58, 1708–09. Together, these choices left the Commissioners, when calculating the overall proportion of spending reflecting the groups' relevant "major purpose," with a relatively small numerator and a relatively large denominator. Thus, the Commissioners calculated that "during the course of its history dating back to 1997, AJS spent over $50 million [to support its mission generally] but

---

[2] AAN contends that the controlling Commissioners "did not . . . draw the line at independent expenditures [i.e., express advocacy] in this case [but] instead left open the possibility that electioneering communications that are the 'functional equivalent' of express advocacy may be relevant to an organization's 'major purpose.'" AAN's Mem. Supp. Mot. Summ. J. ("AAN's MSJ") 19. That may be true as a technical matter, but as discussed below, the Commissioners never defined—properly or otherwise—the "functional equivalent" category. See infra note 10. Moreover, the whole of the Commissioners' analysis regarding whether nine separate electioneering communications sponsored by AJS and twenty such communications sponsored by AAN were "genuine issue ads" amounted to a few summary sentences, or about one paragraph for each organization. See A.R. 1457 (AJS SOR), 1709 (AAN SOR). Perhaps this is why the FEC itself acknowledges that "Commissioners determined that the relevant universe of spending for determining the groups' federal campaign spending was their independent expenditures [i.e., on express advocacy]." FEC's Mem. Supp. Mot. Summ. J. ("FEC's MSJ") 36.

only $4.9 million—or a mere 9.8 percent—of that spending was on express advocacy." A.R. 1458. Similarly, the Commissioners concluded that the "roughly $4.1 million that AAN spent on independent expenditures [i.e., express advocacy] between [its founding in] 2009 and 2011 was the totality of its spending . . . for the purpose of nominating or influencing the election of a federal candidate and represented [only] approximately 15% of its total expenses during the same period." A.R. 1709.

Following the FEC's dismissal of the above complaints, CREW filed a four-count complaint in this Court alleging violations of FECA and the APA, and seeking a declaration that the FEC's dismissal decisions were contrary to law because they applied an incorrect interpretation of the "major purpose" test. Compl. at 28–33. Mainly, CREW challenged the Commissioners' decision to exclude on First Amendment grounds an organization's expenditures that were not express advocacy from the category of spending indicating a campaign-related "major purpose." CREW also challenged the Commissioners' consideration of relative spending over the course of an organization's lifetime—as opposed to within the most recent calendar year—as well as the Commissioners' purported application of a 50%-plus spending threshold for relevant expenditures.

This Court subsequently granted the FEC's Motion to Dismiss all APA-related counts, and granted AAN's Motion to Intervene as an additional Defendant. CREW has now moved and Defendants have cross-moved for summary judgment on the remaining, FECA-related counts.[3]

---

[3] AAN—and not the FEC—argues that CREW lacks Article III standing before this Court. The argument is that the five-year statute of limitations has run on CREW's administrative complaints, and that therefore CREW cannot "demonstrate a significant likelihood that a decision of [this] Court would redress its alleged injury," Spectrum Five LLC v. FCC, 758 F.3d 254, 256 (D.C. Cir. 2014), since the FEC has a practice of not pursuing stale enforcement actions even to obtain equitable relief such as political committee registration. AAN's MSJ 38–43. But, as CREW points out, the AAN cites no "authoritative policy or rule of

Oppositions and replies have been filed, and a hearing was held on the motions.[4]

## II.   Legal Standards

The Court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under these circumstances, where summary judgment is sought regarding certain of the FEC's dismissal decisions, this Court will grant summary judgment to the challenger only if the agency's decisions are "contrary to law," 52 U.S.C. § 30109(a)(8)(C), meaning either that "the FEC dismissed the complaint as a result of an impermissible interpretation of [FECA]," or that "the FEC's dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion." Orloski v. FEC, 795 F.2d 156, 161 (D.C. Cir. 1986).

This same standard of review applies to all FEC decisions, whether they be unanimous or determined by tie vote. In re Sealed Case, 223 F.3d 775, 779 (D.C. Cir. 2000) ("We have . . . held that we owe deference to a legal interpretation [issued by the FEC] supporting a negative probable cause determination that prevails on a 3–3 deadlock."); NRSC, 966 F.2d at 1476 ("[I]f the meaning of [FECA] is not clear, a reviewing court should accord deference to the Commission's rationale . . . [even in] situations in which the Commission deadlocks and

_____

the FEC that would bar equitable enforcement" of its claim. Pls.' Reply Mot. Summ. J. ("Pls.' Reply") 48 n.25.  Nor has the FEC admitted to such a practice or addressed this issue in its briefing or at the motions hearing.  This is fatal to AAN's standing argument.  Finally, the mere fact that the FEC has discretion to dismiss CREW's complaint for another reason does not vitiate the redressability of CREW's claim. See FEC v. Akins, 524 U.S. 11, 25 (1998) ("Akins II") ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason.").

[4] CREW made clear at the hearing on the parties' motions that its challenges are limited to the FEC's articulation of the "major purpose" *standard*, as opposed to the agency's *application* of that standard.  The Court will limit the scope of its review accordingly.

dismisses." (citing Democratic Cong. Campaign Comm. v. FEC, 831 F.2d 1131, 1135 n.5 (D.C. Cir. 1987) and Common Cause v. FEC, 842 F.2d 436, 439 (D.C. Cir. 1988))). This follows because the Commissioners voting for dismissal "constitute a controlling group for purposes of the decision," and so "their rationale necessarily states the agency's reasons for acting as it did." NRSC, 966 F.2d at 1476.[5]

Usually, when a court's review turns on an interpretation of FECA's terms, the "contrary to law" standard involves a straightforward application of the familiar two-step framework outlined in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842–43. See Orloski, 795 F.2d at 161–62 (D.C. Cir. 1986) (applying Chevron analysis to evaluate the FEC's interpretation of the terms "contribution" and "expenditure" as defined by FECA).

But this is not a usual case. CREW's primary challenge regards the FEC's understanding of the constitutional dimensions of a Supreme Court-authored test which was itself developed to

---

[5] CREW contends that none of the above precedent is good law after United States v. Mead Corp., 533 U.S. 218 (2001), which held it improper to afford a tariff classification Chevron deference because there was "no indication that Congress intended such a ruling to carry the force of law." Id. at 221. The controlling Commissioners' statement of reasons is akin to a tariff ruling, CREW reasons, since their decision "is not binding legal precedent or authority in future cases and is not law." Pls.' Reply 8–9. That might be so, but the prospective, binding nature of an agency's interpretation is not the sole consideration regarding the applicability of Chevron. As the Mead Court noted, the type of delegated authority warranting Chevron deference "may be shown in a variety of ways, as by an agency's power to engage in adjudication . . . or by some other indication of comparable congressional intent." Mead, 533 U.S. at 227. The court in Sealed Case engaged in a thorough consideration of just such "indication[s]," observing that an FEC enforcement decision, even one produced by deadlock, is "part of a detailed statutory framework for civil enforcement . . . analogous to a formal adjudication," that it "assumes a form expressly provided for by Congress," and that ultimately it can result in the imposition of criminal penalties. 223 F.3d at 780 (internal citations omitted). All of those considerations led the court to conclude that an FEC enforcement decision "falls on the Chevron side of the line." Id. In sum, seeing nothing in Mead that directly contradicts Sealed Case, the Court will abide its "obligat[ion] to follow controlling circuit precedent." United States v. Torres, 115 F.3d 1033, 1036 (D.C. Cir. 1997).

avoid potential constitutional infirmities. In other words, the challenge turns directly and almost

exclusively on judicial precedent—Buckley itself, but even more so a long line of First

Amendment-related cases in Buckley's shadow. Under such circumstances, Chevron can have

no sound place in evaluating whether an FEC interpretation is "contrary to law." This is why a

near-unanimous D.C. Circuit, sitting *en banc*, rejected the FEC's "plea for deference" on the

question of whether the Supreme Court had imposed the major purpose test in the first place,

concluding that the deference argument was "doctrinally misconceived." Akins v. FEC, 101

F.3d 731, 740 (D.C. Cir. 1996), vacated on other grounds, 524 U.S. 11 (1998).[6] The court

elaborated that it was

> not obliged to defer to an agency's interpretation of Supreme Court precedent under
> Chevron or any other principle. The Commission's assertion that Congress and the
> Court are equivalent in this respect is inconsistent with Chevron's basic premise.
> Chevron recognized that Congress delegates policymaking functions to agencies,
> so deference by the courts to agencies' statutory interpretations of ambiguous
> language is appropriate. But the Supreme Court does not, of course, have a similar
> relationship to agencies, and agencies have no special qualifications of legitimacy
> in interpreting Court opinions. There is therefore no reason for courts—the
> supposed experts in analyzing judicial decisions—to defer to agency interpretations
> of the Court's opinions. This is especially true where, as here, the Supreme Court
> precedent is based on constitutional concerns, which is an area of presumed judicial
> competence.

---

[6] Defendants highlight that Akins was vacated and therefore has no binding effect. See
FEC's Reply Mot. Summ. J. ("FEC's Reply") 7; AAN's Reply 6. True, but its reasoning has
been adopted by subsequent D.C. Circuit panels, see, e.g., Univ. of Great Falls v. N.L.R.B., 278
F.3d 1335, 1341 (D.C. Cir. 2002); N.Y. N.Y., LLC v. N.L.R.B., 313 F.3d 585, 590 (D.C. Cir.
2002), and as an expression of the views of nine judges in this circuit, it is as persuasive as non-
precedential authority can be. AAN further argues that Akins "reached only the question of
'*whether* the Court established a major purpose test,' and not '*how* such a test is to be
implemented.'" AAN's Reply 7 (citing Akins, 101 F.3d at 740–41). That is far from clear,
especially given that the language AAN quotes comes from a portion of the Akins opinion that is
merely describing an argument put forth by the FEC (and an argument that is not directly
returned to). In any event, as described below, the Court does not read Akins broadly to
prescribe de novo review for all FEC actions implicating the major purpose test.

Id. In case after case, courts have affirmed this fairly intuitive principle, that courts need not, and should not, defer to agency interpretations of opinions written by courts. See, e.g., Nat'l Ass'n of Mfrs. v. N.L.R.B., 717 F.3d 947, 959 n.17 (D.C. Cir. 2013) ("[W]e owe no deference to an agency's interpretation of judicial precedent."), overruled on other grounds, Am. Meat Inst. v. U.S. Dep't of Agric., 760 F.3d 18 (D.C. Cir. 2014); Univ. of Great Falls v. N.L.R.B., 278 F.3d 1335, 1340–41 (D.C. Cir. 2002) (declining to apply deference where "interpretation of precedent, rather than a statute" was at issue, especially where that precedent was "based on constitutional concerns, an area of presumed judicial . . . competence"); N.Y. N.Y., LLC v. N.L.R.B., 313 F.3d 585, 590 (D.C. Cir. 2002) (concluding that, as the agency's "decisions . . . purport to rest on [its] interpretation of Supreme Court opinions," those "judgment[s] [are] not entitled to judicial deference."); Piersall v. Winter, 507 F. Supp. 2d 23, 38 (D.D.C. 2007) ("The Court will not defer to [an] agency, however, where the task at hand is judicial interpretation of judicial decisions[.]"); Mudd v. Caldera, 134 F. Supp. 2d 138, 144 (D.D.C. 2001) ("[T]here is no law that supports the . . . position that an Article III judge must defer to an agency or department of the Executive Branch or the head of such an agency or department . . . on interpretations of decisions of the United States Supreme Court; for that is quintessentially a judicial function."). Accordingly, the Court will not afford deference to the FEC's interpretation of judicial precedent defining the protections of the First Amendment and the related contours of Buckley's major purpose test.

Certain of CREW's arguments in this case, however, do not primarily challenge the FEC's interpretation of Supreme Court doctrine, constitutional or otherwise. Rather, CREW's attacks on the FEC's choice of relevant timespan for assessing an organization's spending activity, and on the agency's purported 50%-plus spending threshold for finding major purpose

based on expenditures, are less about *what* Buckley (and subsequent precedent) means and more about *how* Buckley (and the test it created) should be implemented.  Such implementation choices, which call on the FEC's special regulatory expertise, were the types of judgments that Congress committed to the sound discretion of the agency.  The Supreme Court has described the FEC as "precisely the type of agency to which deference should presumptively be afforded," FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 37 (1981), since it is vested with "primary and substantial responsibility for administering and enforcing [FECA]," including the "sole discretionary power" to initiate enforcement actions, Buckley, 424 U.S. at 109, 112 n.153. The statute that the FEC was charged to implement has since been "construe[d]" by the Supreme Court to incorporate the "major purpose" limitation on political committee status.  See Buckley, 424 U.S. at 79, 109; Ctr. For Individual Freedom v. Madigan, 697 F.3d 464, 487 (7th Cir. 2012) ("[T]he 'major purpose' limitation . . . was a creature of statutory interpretation.").  But the Supreme Court's revised construction of the statute did not convert every judicial challenge to an FEC action linked in any way to the major purpose test into an issue for the courts' de novo review.  If it had, this Court would not have deferred to the FEC when the agency decided to adjudicate political committee status—and the major purpose test—rather than promulgate a rule defining it.  But the Court did defer, and rightly so, reasoning that this implementation choice was "exactly the type of question generally left to the expertise of an agency."  Shays, 511 F. Supp. 2d at 31 (citing American Gas Ass'n v. FERC, 912 F.2d 1496, 1519 (D.C. Cir. 1990)).

Of course, those implementation decisions are still reviewable under the "contrary to law" standard, 52 U.S.C. § 30109(a)(8)(C), for a determination of whether "the FEC's dismissal of the complaint . . . was arbitrary or capricious, or an abuse of discretion."  Orloski, 795 F.2d at

161.[7]  In other words, the FEC's decisions are reversible if the Court determines that the agency "entirely failed to consider an important aspect of the [relevant] problem" or has "offered an explanation for its decision that runs counter to the evidence before [it]." Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983)).  At the very least, "[t]he agency must articulate a 'rational connection between the facts found and the choice made.'" Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285–86 (1974) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  While a court ought to "uphold a decision of less than ideal clarity if [an] agency's path may reasonably be discerned," Defs. of Wildlife, 551 U.S. at 658 (quoting Bowman, 419 U.S. at 286), the court should also insist on a "reasonable explanation of the specific analysis and evidence upon which the [a]gency relied," Bluewater Network v. E.P.A., 370 F.3d 1, 21 (D.C. Cir. 2004).

In short, unlike the FEC's views on the Supreme Court's First Amendment jurisprudence, the FEC's choices regarding the timeframe and spending amounts relevant in applying the "major purpose" test are implementation choices within the agency's sphere of competence, and therefore warrant the Court's deference.

---

[7] The FEC asserts that "the challenged dismissal decisions are independently justified by the Commission's broad prosecutorial discretion." FEC's MSJ 49–50.  But "an agency's decision not to take enforcement action . . . is only presumptively unreviewable," and that "presumption may be rebutted [by the relevant] substantive statute." Heckler v. Chaney, 470 U.S. 821, 832 (1985).  Here, FECA's express provision for the judicial review of the FEC's dismissal decisions, as well as a particular standard governing that review, 52 U.S.C. § 30109(a)(8)(C), is just such a rebuttal.  The Court will therefore apply the contrary-to-law standard, as Congress has instructed it to.

### III.   Analysis

CREW advances three main objections to the Commissioners' rationale for dismissal. Primarily, it faults the Commissioners for applying an exceedingly narrow definition of "political committee," such that only expenditures on express advocacy—and no expenditures on electioneering communications—were deemed relevant to the "major purpose" inquiry. Pls.' Mem. Supp. Mot. Summ. J. ("Pls.' MSJ") 17. Second, CREW argues that the Commissioners "impermissibly interpreted the 'major purpose' test to require an evaluation of a group's activities over its entire existence," as opposed to applying a calendar-year approach. Id. Finally, CREW asserts that the Commissioners erroneously required a group's campaign-related spending to constitute at least 50% of total spending before concluding that such spending indicated the entity's "major purpose." Id. The Court will consider each challenge in turn.

A. Spending Relevant to the "Major Purpose" Analysis

CREW principally argues that the controlling Commissioners improperly "interpreted the 'major purpose' test to capture only those groups who spend a majority of their budget on express advocacy, to the exclusion of all other campaign activity, including electioneering communications." Pls.' MSJ 25. The FEC concedes that the "Commissioners determined that the relevant universe of spending for determining the groups' federal campaign spending was their independent expenditures [i.e., on express advocacy]," but the agency insists that this decision was consistent with judicial precedent and therefore "reasonable and not contrary to law." FEC's Mem. Supp. Mot. Summ. J. ("FEC's MSJ") 36.

The Commissioners grounded their decision to separate express advocacy ads from issue ads, and to count only spending on the first category as indicating a "major purpose" to "nominat[e] or elect[] . . . a candidate," Buckley, 424 U.S. at 79, in FEC v. Wisconsin Right To

Life, Inc. (WRTL II), 551 U.S. 449 (2007).  A.R. 1450–51 (AJS SOR); A.R. 1702 (AAN SOR).

That case considered an as-applied challenge to the constitutionality of Section 203 of the

Bipartisan Campaign Reform Act of 2002 ("BCRA"), 52 U.S.C. § 30118, which criminalized the

broadcasting of electioneering communications by corporations.  Id. at 455–56.  The Court

explained that "the interests held to justify the regulation of campaign speech and its 'functional

equivalent' 'might not apply' to the regulation of issue advocacy," and it went on to invalidate

the ban on corporate electioneering communications as it applied to advertisements that were *not*

the "functional equivalent" of express advocacy.  Id. 457, 481 (quoting McConnell v. FEC, 540

U.S. 93, 206 & n.88).  The Court further clarified that an electioneering communication could be

the functional equivalent of express advocacy—and therefore subject to more substantial

regulation consistent with the First Amendment—if "the ad is susceptible of no reasonable

interpretation other than as an appeal to vote for or against a specific candidate."  Id. at 469–70.

WRTL II, then, drew a bold line between express advocacy (and its functional

equivalent), which it deemed more regulable, and issue advocacy, which it deemed less so.

Crucially, though, the Court developed that distinction in the context of an outright *ban* on

speech.  Since then, the overwhelming weight of legal authority, beginning with the Supreme

Court itself, has concluded that the WRTL II framework is not properly applied in the context of

less restrictive *disclosure* requirements.

In Citizens United, the plaintiff argued that certain of BCRA's disclosure requirements

should "be confined to speech that is the functional equivalent of express advocacy," seeking to

"import [WRTL II's] distinction into BCRA's disclosure requirements."  558 U.S. at 368–69.

The Court flatly "reject[ed] th[at] contention."  Id. at 369.  Collecting cases in support of the

proposition that "disclosure is a less restrictive alternative to more comprehensive regulations of

speech," the Court went on to engage in a point-by-point refutation of the arguments Citizens United advanced in favor of a broader application of WRTL II's dichotomy. Id. In doing so, the Court framed the public's informational interest justifying disclosure in especially broad terms, emphasizing that "the public has an interest in knowing *who is speaking about a candidate shortly before an election.*" Id. (emphasis added).

In the wake of Citizens United, federal appellate courts have resoundingly concluded that WRTL II's constitutional division between express advocacy and issue speech is simply inapposite in the disclosure context. See, e.g., Indep. Inst. v. Williams, 812 F.3d 787, 795 (10th Cir. 2016) ("It follows from Citizens United that disclosure requirements can . . . reach beyond express advocacy to at least some forms of issue speech."); Del. Strong Families v. Att'y Gen. of Del., 793 F.3d 304, 308 (3d Cir. 2015), cert. denied sub nom., Del. Strong Families v. Denn, 136 S. Ct. 2376 (2016) ("Any possibility that the Constitution limits the reach of disclosure to express advocacy or its functional equivalent is surely repudiated by Citizens United v. FEC."); Vt. Right to Life Comm., Inc. v. Sorrell (VRTL), 758 F.3d 118, 132 (2d Cir. 2014), cert. denied, 135 S. Ct. 949 (2015) ("In Citizens United, the Supreme Court expressly rejected [limiting] disclosure requirements . . . to speech that is the functional equivalent of express advocacy," thereby "remov[ing] any lingering uncertainty concerning the reach of constitutional limitations in [the disclosure] context." (internal citations omitted)); Ctr. for Individual Freedom v. Madigan, 697 F.3d 464, 484 (7th Cir. 2012) ("Whatever the status of the express advocacy/issue discussion distinction may be in *other* areas of campaign finance law, Citizens United left no doubt that disclosure requirements need not hew to it to survive First Amendment scrutiny." (emphasis added)); Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 54–55 (1st Cir. 2011) ("[T]he issue/express advocacy dichotomy has only arisen in a narrow set of circumstances not

present here. . . . We find it reasonably clear, in light of <u>Citizens United</u>, that [this] distinction . . .

has no place in First Amendment review of these sorts of disclosure-oriented laws."); <u>Human

Life of Wash., Inc. v. Brumsickle</u>, 624 F.3d 990, 1016 (9th Cir. 2010) ("[In <u>Citizens United</u>,] the

Court explained that the distinction between express and issue advocacy . . . did not translate into

the disclosure context.  Given the Court's . . . holding that the government may impose

disclosure requirements on speech, the position that disclosure requirements cannot

constitutionally reach issue advocacy is unsupportable."); <u>cf.</u> <u>Iowa Right To Life Comm., Inc. v.

Tooker</u>, 717 F.3d 576, 591 (8th Cir. 2013) (suggesting and declining to resolve a "split" among

pre- <u>and</u> post-<u>Citizens United</u> appellate decisions regarding "whether state campaign-finance

disclosure laws can impose PAC status or burdens on groups lacking <u>Buckley</u>'s major purpose").

Faced with this weight of contrary legal authority, the controlling Commissioners

grounded their decision to apply <u>WRTL II</u>'s framework on an outlier: a single case that

examined <u>Citizens United</u>'s treatment of BCRA's disclosure requirements and nevertheless

concluded that <u>WRTL II</u>'s framework retains some proper applicability in the disclosure

context.[8] A.R. 1448 (AJS SOR); A.R. 1700 (AAN SOR); FEC's MSJ 37; AAN's AAN's Mem.

---

[8] Defendants, and the controlling Commissioners in their statement of reasons, also cite
<u>New Mexico Youth Organized v. Herrera</u>, 611 F.3d 669 (10th Cir. 2010), in support of the
decision to apply the express advocacy limitation in the political committee context.  A.R. 1448–
49 (AJS SOR); A.R. 1700 (AAN SOR); FEC's MSJ 38.  Although <u>Herrera</u> was decided after
<u>Citizens United</u>, the briefing the case relied on was completed before that decision.  Accordingly,
<u>Herrera</u>'s only reference to the Supreme Court's opinion is the statement, included in a footnote,
that "[a]lthough [<u>Citizens United</u>] left many issues unresolved, we believe [the opinion did not
change the] requirement . . . that for a regulation of campaign related speech to be constitutional
[that speech] must be unambiguously campaign related." <u>Id.</u> at 676 n.4.  Given <u>Herrera</u>'s
cursory treatment of the decision, it is best considered a pre- rather than a post-<u>Citizens United</u>
case.  All other cases cited by the controlling Commissioners for their exclusion of non-express
advocacy from the major purpose analysis predate <u>Citizens United</u>.  <u>See</u> A.R. 1448–49 (AJS
SOR) (citing <u>N. Carolina Right to Life, Inc. v. Leake</u>, 525 F.3d 274  (4th Cir. 2008); <u>Col. Right
To Life Comm., Inc. v. Coffman</u>, 498 F.3d 1137 (10th Cir. 2007); <u>FEC v. Malenick</u>, 310 F.

Supp. Mot. Summ. J. ("AAN's MSJ") 28.  That case, <u>Wisconsin Right To Life, Inc. v. Barland</u>,

751 F.3d 804 (7th Cir. 2014), sought to limit <u>Citizens United</u>'s rejection of the express advocacy

limitation "to the specifics of the disclosure requirement [there] at issue." <u>Id.</u> at 836.  The

<u>Barland</u> court surmised that <u>Citizens United</u> was only "addressing the onetime, event-driven

disclosure rule for federal electioneering communications, [and not] the comprehensive,

continuous reporting regime imposed on federal PACs." <u>Id.</u>  This cramped interpretation placed

<u>Barland</u> in conflict with the vast majority of appellate courts, including a prior panel in its own

circuit, <u>see Madigan</u>, 697 F.3d at 484 (rejecting the "express advocacy/issue discussion

distinction" as applied to political committee-related "disclosure requirements"), and the opinion

has since been roundly criticized, <u>see VRTL</u>, 758 F.3d at 132 (faulting <u>Barland</u>'s attempt to

"confine[] [<u>Citizens United</u>] to its 'specific and narrow context,'" as the Supreme Court provided

"no indication that [its] ruling depended on the type of disclosure requirement it upheld").

    <u>Barland</u> is out of step with the legal consensus not only because it read nonexistent

qualifiers into a Supreme Court opinion, but also because it rested on a flawed premise: that the

"event-driven disclosure rule[s] [considered in <u>Citizens United</u>] are *far less burdensome* than the

comprehensive registration and reporting system imposed on political committees." 751 F.3d at

824 (emphasis added).  Defendants, too, make much of the "burdensome" nature of "registration,

reporting, and regulatory obligations that attach to political committee status under FECA."

AAN's Reply Mot. Summ. J. ("AAN's Reply") 12; <u>see also</u> FEC's Reply Mot. Summ. J.

("FEC's Reply") 20; AAN's MSJ 28.  But these characterizations are not on firm doctrinal

footing.  Courts, including the D.C. Circuit sitting *en banc*, have repeatedly classed periodic

---

Supp. 2d 230 (D.D.C. 2004); <u>FEC v. GOPAC, Inc.</u>, 917 F. Supp. 851 (D.D.C. 1996)); A.R.
1700–01 (AAN SOR) (same).

reporting and registration requirements with other disclosure regimes, applying to them the very same, less-stringent level of constitutional scrutiny. SpeechNow.org v. FEC, 599 F.3d 686, 696 (D.C. Cir. 2010) (en banc) (categorizing the FEC's "organizational and reporting requirements" as "disclosure requirements," which "inhibit speech less than do contribution and expenditure limits"). In particular, to justify disclosure requirements, including those attending political committee status, "the government may point to any 'sufficiently important' governmental interest that bears a 'substantial relation' to the disclosure requirement." Id. (quoting Citizens United, 130 S. Ct. at 914)); see also, e.g., VRTL, 758 F.3d at 137 (applying lower level of scrutiny to registration and reporting requirements attending political committee status); Catholic Leadership Coal. of Texas v. Reisman, 764 F.3d 409, 424–25 (5th Cir. 2014) (same); Worley v. Florida Sec'y of State, 717 F.3d 1238, 1243–44 (11th Cir. 2013) (same); Human Life, 624 F.3d at 1012–14 (2010) (same).

Applying this standard of review, the D.C. Circuit described the additional burdens of "designating a treasurer and retaining records" as not "impos[ing] much of an additional burden on" political committees, particularly where—as is the case here—those entities "intend[] to comply with the [event-driven] disclosure requirements that . . . apply even [in the absence of] political committee" status. SpeechNow, 599 F.3d at 696–97. The court balanced these relatively modest burdens of registration and reporting against the broad public interest in knowing "who is speaking about a candidate and who is funding that speech," which "deters and helps expose violations of other campaign finance restrictions." 599 F.3d at 698. As might be

expected, the court concluded that "[t]hese are sufficiently important governmental interests to justify requiring [a political committee] to organize and report to the FEC." Id.

Other courts have applied the same analysis, and arrived at the same result. "[T]he majority of circuits have concluded that . . . disclosure requirements [related to registration and reporting] are not unduly burdensome." Yamada v. Snipes, 786 F.3d 1182, 1195 (9th Cir.), cert. denied sub nom., Yamada v. Shoda, 136 S. Ct. 569 (2015); see also, e.g., VRTL, 758 F.3d at 137–38 (upholding against constitutional attack political committee "registration, recordkeeping . . . and reporting requirements," and rejecting the argument that such "burdens that are 'onerous' as a matter of law"); Worley, 717 F.3d at 1250 (concluding that the state's "PAC regulations do not generally impose an undue burden"); McKee, 649 F.3d at 56 (noting that the state's PAC burdens "do not prohibit, limit, or impose any onerous burdens on speech").[9] Considering the weight of the above precedent, the Court has little trouble concluding that the Commissioners' decision to apply WRTL II's express advocacy/issue speech distinction in the realm of disclosure, thereby excluding *all* non-express advocacy speech from consideration, was "contrary to law." 52 U.S.C. § 30109(a)(8)(C).[10]

The Court will not go further, however, as urged by CREW, and declare contrary to law *any* approach taken by the FEC that does not assess political committee status by considering *all*

---

[9] Defendants seek additional support in language from Citizens United describing the burdens associated with political committees. 558 U.S. at 339. See, e.g., A.R. 1443 (AJS SOR); A.R. 1694–95 (AAN SOR); FEC's MSJ 32; AAN's Reply 12. But that discussion "consider[ed] a regime that required corporations to set up a *separate* legal entity and create a segregated fund *prior to engaging in any direct political speech.*" McKee, 649 F.3d at 56 (emphasis added). No such requirements are implicated here. In any event, the Court does not presume to say that the burdens on a political committee are negligible, only that "sufficiently important governmental interests" may "justify" a political committee definition broader than the one applied by the controlling Commissioners. SpeechNow, 599 F.3d at 698.

[10] Furthermore, although this was not an issue briefed by the parties, the Court notes that the FEC's decision was "contrary to law" for an additional, independent reason. Having chosen

electioneering communications as indicative of a "purpose" to "nominat[e] or elect[] . . . a candidate." Buckley, 424 U.S. at 79. See Pls.' MSJ 26. CREW's citations to legislative history, past FEC precedent, and court precedent certainly support the conclusion that *many* or even *most* electioneering communications indicate a campaign-related purpose. Id. at 26–30. Indeed, it blinks reality to conclude that many of the ads considered by the Commissioners in this case were not designed to influence the election or defeat of a particular candidate in an ongoing race. However, particularly given the FEC's judicially approved case-by-case approach to adjudicating political committee status, see SE & J, 72 Fed. Reg. at 5597; Shays, 511 F. Supp. 2d at 3, the Court will refrain from replacing the Commissioners' bright-line rule with one of its own.

Instead, the Court will limit itself to identifying the legal error in the Commissioners' statements—that is, the erroneous understanding that the First Amendment effectively required the agency to exclude from its consideration all non-express advocacy in the context of disclosure. Since the FEC "based its decision upon an improper legal ground," the Court "will

---

to incorporate WRTL II as a framework for conducting their major purpose analysis, the Commissioners articulated a partial—and ultimately inaccurate—version of that standard. The Commissioners did not draw from WRTL II its key test for identifying functional equivalents of express advocacy, i.e., those ads that are "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." 551 U.S. at 469–70. Indeed, that standard appears nowhere in the Commissioners' statements of reasons. Instead, the Commissioners drew from the case a long list of characteristics that were *in*sufficient to place an ad in the "functional equivalent" category. See A.R. 1450–51, 1702 (identifying, *inter alia*, "appeal[s] to contact a candidate" or "promot[ing] or criticiz[ing]" a candidate as inadequate to "render a communication electoral advocacy"). Similarly, the Commissioners indicated that only "genuine" issue speech should be excluded from the "major purpose" analysis, but never did they explain how an electioneering communication could ever fail to be a "genuine" issue ad. That concept, too, was defined in the negative. See A.R. 1454, 1705 ("Genuine issue speech does not lose its character merely by mentioning—or even promoting or criticizing—a federal candidate."). In short, not only did the Commissioners improperly import a standard, they also stated an incomplete version of that standard.

set aside the agency's action and remand the case" for its reconsideration in light of the correction. FEC v. Akins, 524 U.S. 11, 25 (1998) ("Akins II").

### B. Relevant Time Period for Measuring Expenditures

CREW also contends that the controlling Commissioners erred by evaluating the challenged groups' spending over their entire existence, as opposed to confining their analysis to spending within the most recent calendar year. Pls.' MSJ 37–40. There is no doubt that the controlling Commissioners focused almost exclusively on lifetime, and not calendar-year, spending. See, e.g., A.R. 1438 (AJS SOR) ("[W]e believe AJS—an organization that has spent less than ten percent of its funds on express advocacy *during its entire existence*—is an issue-advocacy organization that cannot be regulated as a political committee[.]" (emphasis added)); A.R. 1439 (AJS SOR) ("The overwhelming majority of [AJS's] spending *since inception* has related to pure issue advocacy[.]" (emphasis added)); A.R. 1456–57 (AJS SOR) ("[T]he Commission assesses an organization's major purpose by *reference to its entire history.*" (emphasis added)); A.R. 1709 (AAN SOR) (evaluating AAN's spending "between 2009 and 2011," i.e., since the organization's founding). Indeed, the Commissioners expressly rejected the calendar-year approach, advanced by the FEC's Office of General Counsel, as "myopic, distortive, and legally erroneous." A.R. 1461 (AJS SOR); A.R. 1713 (AAN SOR).

The FEC argues that the "Commissioners' decision to use the entire record before it was neither unreasonable nor contrary to law," since "[n]either FECA nor any judicial decision specifies a particular time period for determining a group's major purpose." FEC's MSJ 41–45. The Court agrees, as a general matter. Given the FEC's embrace of a totality-of-the-circumstances approach to divining an organization's "major purpose," it is not *per se*

unreasonable that the Commissioners would consider a particular organization's full spending history as relevant to its analysis.

However, the Commissioners have gone further than merely eschewing the calendar-year approach as a "rigid, one-size-fits-all rule" at odds with the FEC's chosen case-by-case method. A.R. 1462. Rather, they have replaced that rule with a different—but equally inflexible—metric. Looking *only* at relative spending over an organization's lifetime runs the risk of ignoring the not unlikely possibility, contemplated by the Supreme Court, that an organization's major purpose can *change*. See MCFL, 479 U.S. at 262 (recognizing that a group's "spending [may] *become* so extensive that the organization's major purpose may be regarded as campaign activity [such that] the corporation would be classified as a political committee." (emphasis added)). That is precisely the trajectory that AJS appears to have followed. It spent no money on election-related spending until 2008, but then shifted its expenditures towards electioneering communications and express advocacy over the following several years.

The Commissioners' refusal to give any weight whatsoever to an organizations' relative spending in the most recent calendar year—particularly in the case of a fifteen-year-old organization like AJS—indicates an arbitrary "fail[ure] to consider an important aspect of the [relevant] problem." Defs. of Wildlife, 551 U.S. at 658. The seriousness of that failure would only increase with the lifespan of the challenged organization: A half-century-old organization with a substantial spending history could commence spending handsomely on election-related ads and continue such expenditures for decades before its new "major purpose" would be detected by the controlling Commissioners' lifetime-only approach. Surely, that cannot be what Congress contemplated in defining "political committee" in terms of calendar-year spending under FECA, see 52 U.S.C. § 30101(4) (defining political committee as an entity with more than

$1,000 in contributions or expenditures *in a calendar year*), nor can it be what the Supreme Court intended with its "major purpose" narrowing instruction, see MCFL, 479 U.S. at 262.

The Court therefore concludes that the Commissioners' lifetime-only rule—at least as applied to AJS—is "contrary to law," 52 U.S.C. § 30109(a)(8)(C), in that it tends to ignore crucial facts indicating whether an organization's major purpose has changed, and is inconsistent with the FEC's stated fact-intensive approach to the "major purpose" inquiry.

C.   The 50%-of-Total-Spending Threshold

Finally, CREW contends that the controlling Commissioners erred in applying a "rigid 50% [spending] threshold" when evaluating an entity's major purpose. Pls.' MSJ 40–41. CREW points mainly to a footnote, where the Commissioners state that AJS would still fail the major purpose test following the calendar-year approach because even then "only $4.9 million (or approximately 40%)" of AJS's spending in 2010 was allocated to independent expenditures, and "[s]uch spending does not clearly signify a major purpose of engaging in express advocacy." A.R. 1463 n.151.

There are multiple flaws in CREW's argument, but most importantly, it is far from apparent that the Commissioners did apply any such 50%-plus spending threshold for defining major purpose. Neither the AJS nor the AAN statement specifically identifies a 50%-plus threshold. The Commissioners merely said, with respect to AJS, that 40% of spending "does not clearly signify a major purpose," A.R. 1463, and the proportion of AAN's spending on express advocacy was so low—roughly 15%—that any purported 50% threshold was irrelevant, A.R. 1709.   In any event, CREW's argument also fails because "[r]eview under the arbitrary and

capricious standard is deferential." Defs. of Wildlife, 551 U.S. at 658. A reasonable application of a 50%-plus rule would not appear to be arbitrary and capricious.

## IV.    Remedy and Conclusion

In sum, notwithstanding the likely permissibility of a 50%-plus spending threshold (if such a threshold was even applied), the Court concludes that the controlling Commissioners relied on a faulty legal premise in applying the "major purpose" test. In particular, the Commissioners incorrectly determined that WRTL II's framework applied in the context of a less restrictive disclosure regime. Likewise, the Commissioners' decision to give *full* weight to the relative spending of the challenged organizations over their entire lifetimes, as a "fail[ure] to consider an important aspect of the [relevant] problem," Defs. of Wildlife, 551 U.S. at 658, was arbitrary and capricious.

The Commissioners' decisions to dismiss CREW's complaints against AJS and AAN were thus "contrary to law," and the Court accordingly "direct[s] the Commission to conform with [this] declaration within 30 days." 52 U.S.C. § 30109. See also Akins II, 524 U.S. at 25 ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case[.]"); Gonzales v. Thomas, 547 U.S. 183, 186 (2006) ("[After deeming an agency's action arbitrary and capricious,] the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." (quoting I.N.S. v. Orlando Ventura, 537 U.S. 12, 16 (2002)). If the FEC does not appeal this decision or act in accordance with the Court's declaration within 30 days, "the complainant may bring . . . a civil action to remedy the violation involved in the original complaint." 52 U.S.C. § 30109.

The Court will grant CREW's motion for summary judgment and deny the FEC's and

AAN's cross-motions.  An Order accompanies this Memorandum Opinion.


CHRISTOPHER R. COOPER
United States District Judge


Date:  September 19, 2016